UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTHA JOHNSON,

                Plaintiff,                 Civil Action No. 10-cv-11412

          v.                      District Judge John Corbett O'Meara
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

## I. RECOMMENDATION

Plaintiff Martha Johnson brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties filed summary judgment motions which are referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkts. 10,13.)  For the reasons set forth below, the Court  finds that the Commissioner's determination that Plaintiff is not disabled is supported by substantial evidence.  Accordingly, the Court RECOMMENDS that  Plaintiff's Motion for Summary Judgment be DENIED, Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

1

## II. REPORT

### A. Procedural History

Plaintiff filed this suit on April 8, 2010, alleging that she became unable to work on May 22, 2005. (Tr. 15.) The Commissioner initially disapproved her claim on November 4, 2005. (Tr. 33-36.) Plaintiff then filed a timely request for a hearing, and on April 15, 2008, Administrative Law Judge ("ALJ") Henry Perez held a hearing. (Tr. 310.) Plaintiff was represented by counsel at the hearing. (Tr. 310.) In a decision dated July 1, 2008, the ALJ found that Plaintiff was not disabled. (Tr. 10-23.) The ALJ's decision became the final decision of the Commissioner on April 5, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. 5.)

### B. Background

Plaintiff was 45 years old at the time of the ALJ's decision. (Tr. 22.) She has limited education and is illiterate.[1] (Tr. 22.) Plaintiff previously worked as a certified nurse's assistant ("CNA"). (Tr. 22.)

#### 1. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff recounted symptoms and limitations related to degenerative disc disease of the lumbar and cervical spine, lumbar radiculopathy, carpal tunnel syndrome, obesity, depression and anxiety. (Tr. 312-20.) Plaintiff testified that because of her back

---

[1] Plaintiff testified that she cannot read (Tr. 318), but a clinical report from 1999 indicates that "[i]n the last three and one-half years, she has been promoted from a CNA to receptionist and now she is going to be in charge, as of Thursday, of managing stock and ordering. She manages her personal bills with the use of a computer and a tickler system where she will write down the date due and make sure they are sent out ahead of time. . . . Reading is always troublesome for her . . . . she will only read what is necessary for what is needed to accomplish her work." (Tr. 116.)

2

problems she cannot "sit too long" or "stand too long." (Tr. 314.) She also stated that she cannot "lift anybody." (Tr. 314.) Plaintiff walks with a cane. (Tr. 315.) With regard to her depression, Plaintiff explained that she cannot "think real good" and has "racing thoughts." (Tr. 316.) Plaintiff testified that she sleeps "[t]he majority of the day, about 15 hours." (Tr. 316.) During the remaining nine hours of the day, she is "laying down." (Tr. 316.) She claims that medication does not help her depression, and her husband does all the household chores. (Tr. 317-19.) Regarding her obesity, Plaintiff weighs 350 pounds and is approximately five feet, three-and-a-half inches tall. (Tr. 320.)

2. *Medical Evidence*

Plaintiff's medical records come from four main sources – the Sierra Medical Group, Harper Hospital, the Detroit Medical Center, and her treating physician, Dr. James Haney, D.O. Regarding her back impairments and carpal tunnel syndrome, Plaintiff saw Dr. L. Mangulabnan, M.D. and Dr. Cynthia Shelby-Lane, M.D. from the Sierra Medical Group. (Tr. 218-226.) Plaintiff also had an EMG performed and analyzed by Dr. Adel A. El-Magrabi, M.D., Dr. Y. Liu, M.D. and Dr. J. Li, M.D. of Harper Hospital. (Tr. 232.) As stated above, Dr. James Haney, D.O. was her treating physician. (Tr. 262-67.) Regarding her mental impairments, Plaintiff saw Dr. John T. Dziuba, M.D. and Clinical Nurse Practitioner Kevin Frasier of the Detroit Medical Center. (Tr. 212-61.) She also saw Dr. Leonard Lachover, M.D. of the Detroit Medical Center on February 22, 2008. (Tr. 265-66.)

On May 12, 2005, Plaintiff had an MRI. (Tr. 216.) The results indicated that Plaintiff had a "central disc protrusion" at disc space L5-S1 with possible degenerative disc disease. (Tr. 216.) On July 26, 2005, she had an EMG. (Tr. 222.) Those results indicated that Plaintiff had L5-S1 radiculopathy on the left side. (Tr. 222.)

Subsequently, on October 3, 2005, Plaintiff consulted with Dr. L. Mangulabnan and Dr.

3

Cynthia Shelby-Lane regarding her MRI.   (Tr. 218-226.)   Dr. Mangulabnan indicated that: "[Plaintiff] relates different problems which do not conform or jive with the criteria which she was talking about and does not substantiate what she is saying." (Tr. 219.) Dr. Mangulabnan diagnosed Plaintiff with an anxiety disorder, "back problems," "carpal tunnel syndrome" and gave her a Global Assessment of Functioning ("GAF") rating of 70.[2]

Dr. Cynthia Shelby-Lane indicated that Plaintiff had "no obvious spinal deformity, swelling or muscle spasm." (T 225.) She did, however, have "tenderness" in the "low lumbar area," and used an "elastic back brace for support and reduction of pain." (Tr. 225.) Dr. Shelby-Lane also noted that Plaintiff had a cane, but "did not need to use it during the exam." (Tr. 225.)

The record also contains a November 8, 2005 note from Dr. Adel A. El-Magrabi that states: "Ms. Johnson is totally and permanently disabled" as a result of "[l]umbo-sacral radulopathy, lumbar spinal stenosis, chronic pain . . . .sacroiliitis, [and] lumbar disc disease." (Tr. 232.) Dr. Magrabi does not indicate what clinical examination or test results he consulted to classify Plaintiff as

---

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed. 1994). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32. A GAF of 41 to 50 means that the patient has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*. A GAF of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.* A GAF of 61 to 70 signals "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well . . . . some meaningful interpersonal relationships." *Id*. at 34. It should be noted, however, that a GAF score itself is not a medical opinion. *Howard v. Comm'r of Soc. Sec*. 276 F.3d 235, 241 (6th Cir. 2002). Therefore, the ALJ is not required to address the score in his narrative decision. *Id*.

4

"permanently disabled."[3]  (Tr. 232.)

On September 1, 2006, Dr. Y. Liu and Dr. J. Li conducted an EMG of Plaintiff.  (Tr. 233.)

They concluded that while Plaintiff *could* suffer from "mild lumbar radiculopathy . . . [a]n image

study of her lumbosacral spine would be helpful."  (Tr. 234.)

On November 22, 2006, Dr. James Haney indicated in a hand-written note that Plaintiff's

pain has "become progressively worse over the last five years."[4]  (Tr. 262.)  He also indicated that

she "has difficulty walking 25 ft without stopping" and "can only stand 5 min without sitting."  (Tr.

262).  In addition, he indicated that Plaintiff is "unable to bend, stoop or climb."  (Tr. 262.)  She also

has limitations on her "forward flexion and ability to twist."  (Tr. 263.)

Plaintiff also suffers from mental impairments – namely, depression.  On June 13, 2005, Dr.

John T. Dziuba of the Detroit Medical Center evaluated Plaintiff's depression.  (Tr. 212.)  At that

time, Plaintiff indicated that she was a 5 on a scale of 1 to 10, with 10 meaning, "doing great."  (Tr.

212.)  She also indicated "[d]ecreased socialization, tearfulness everyday, increased sleep of 12-15

hours, decreased appetite with unknown weight loss."  (Tr. 213.)  She "denied suicidal and

homicidal ideation and intent."  (Tr. 213.)  Dr. Dziuba gave her a GAF rating of 48. (Tr. 213.)

On July 14, 2005, Plaintiff had another appointment with Dr. Dziuba.  He noted that Plaintiff

"gave a couple of stories" as to why she had not taken her medication – Risperdal.  (Tr. 208.)

Despite stating that "she is not depressed," Plaintiff agreed to follow through with Dr. Dziuba's

---

[3]Notably, only the Commissioner can make the determination as to whether or not an individual is disabled under the meaning of the Act.  20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).

[4]There is no indication in the record that Dr. Haney actually saw or consulted with Plaintiff on or around November 22, 2006, prior to his submission of the above-cited hand-written note in the record.  (Tr. 262.)

recommendation to try Risperdal.  (Tr. 208.)

Plaintiff's next appointment was on July 28, 2005.  At that appointment, Dr. Dziuba noted that Plaintiff stated that "she is not depressed," but acknowledged having "paranoid ideations." (Tr. 206.)

Finally, on August 18, 2005, Plaintiff saw Dr. Dziuba again.  In that evaluation, Plaintiff stated that she has "good days and bad days." (Tr. 201.)  Dr. Dziuba's preliminary report indicates that Plaintiff treats with a therapist regularly.  (Tr. 201.)  Notably, at that time, she told Dr. Dziuba that she had lost 30-40 pounds through exercise.  (Tr. 202.)

Plaintiff continued to consult with doctors, social workers and nurse practitioners on her depression throughout 2006.  (Tr. 243-61.)  Indeed, the record indicates that Plaintiff consulted Clinical Nurse Practitioner Kevin Frasier on December 12, 2006.  (Tr. 241-41.)  She indicated that her mood was a 6 on scale of 1 to 10.  (Tr. 241.)  She claimed to have "decreased motivation, decreased energy," and feelings of helplessness and hopelessness.  (Tr. 241.)  She denied any paranoid, suicidal or homicidal thoughts.  (Tr. 241.)  Frasier gave her a GAF rating of 46.

The record indicates no mental health appointments for 2007.  Plaintiff explained that she lost her insurance at this time.  (Tr. 316.)  Subsequently, on February 25, 2008, Plaintiff saw Dr. Leonard Lachover, M.D.  At that time, Plaintiff claimed to have "visualizations of her brother who had been killed." (Tr. 265.)  In addition, she appeared to be "quite paranoid" throughout her interview.  (Tr.266.) Dr. Lachover diagnosed her with "major depression with psychotic features" and "paranoid disorder." (Tr. 266.)  Dr. Lachover recommended an increase in medication and continued therapy.  (Tr. 266.)

6

### 3. Vocational Expert's Testimony

Vocational Expert Elizabeth Pasikowski testified regarding the existence of jobs for a person of Plaintiff's age, education, and past work experience with the residual functional capacity to perform light work. (Tr. 322.)  VE Pasikowski indicated that there were 4,600 such jobs regionally. (Tr. 322.)  However, such a person could not perform Plaintiff's past relevant work as a certified nurse assistant.  (Tr. 322.)  The ALJ then narrowed the hypothetical significantly, and asked VE Pasikowski if there were such jobs for a person that has the following limitations: 1) "an exertional limitation of 20 pounds occasionally and 10 pounds frequently;" 2) "a sit/stand" limitation; 3) "only occasional climbing, stooping, crouching, balancing, kneeling, and crawling;" 4) "jobs that can be readily learned through verbal instructions or simple demonstration;" 5) "only occasional handling, fingering, and feeling;" 6) "routine production and stress" and 7) "simple job assignments." (Tr. 323.)  VE Pasikowski indicated that Plaintiff would not be able to do her past relevant work, but would be able to perform jobs such as companion, packer, and sorter.  (Tr. 323.)  There would be 3,200 companion jobs, 2,300 packer jobs, and 1,800 sorter jobs nationally that Plaintiff could perform.  (Tr. 323.)  However, if Plaintiff's testimony was fully credited, there would be no jobs Plaintiff could perform.  (Tr. 324.)

## C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income (for poverty stricken adults and children who become disabled) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since

8

May 22, 2005.  (Tr. 15.)

At step two, the ALJ noted that the Plaintiff had "degenerative disc disease of the lumbar and cervical spine; lumbar radiculopathy; carpal tunnel syndrome; obesity; depression; and anxiety." (Tr. 15.)

However, at step three, the ALJ found that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the applicable regulations.  (Tr. 15.)

The ALJ found Plaintiff's testimony regarding her limitations was not "strong evidence  in favor of finding her disabled."  (Tr. 18.)  Indeed, the ALJ found the objective medical evidence of the record outweighed Plaintiff's uncorroborated testimony regarding her limitations (Tr. 18.) First, the ALJ noted that Plaintiff's impairments were present at "the same level of severity prior to the alleged onset date" and she continued to work.  (Tr. 18.)  Second, with regard to her alleged depression, the ALJ noted that Plaintiff wavered between claiming she suffered from depression, anxiety and paranoia to claiming she was "not depressed."  (Tr. 18-19.)

The ALJ also noted that the one letter from Dr. El-Magrabi that indicated Plaintiff was "totally and permanently disabled" was conclusory, "unsupported by treatment notes and without reference to clinical or objective findings."  (Tr. 21.)  Therefore, the ALJ declined to give the letter any weight. (Tr. 21.)

Notably, the ALJ gave Plaintiff's treating physician's opinion "some weight" but rejected Dr. Haney's clinical findings because "they are inconsistent with consultative examiner Dr. Shelby Lane's observations upon examination."  (Tr. 21.)  In addition, his findings were not "supported by treatment records" showing that Plaintiff met the durational requirements necessary to a finding of

9

"disability."  (Tr. 21.)

With regard to step four, the ALJ concluded that the Plaintiff was unable to perform any of her past relevant work as a certified nurse's assistant.  (Tr. 22.)

At step five, the ALJ concluded that Plaintiff had the residual functional capacity for occupations such as companion , packer and sorter.  (Tr. 23.)  Given Plaintiff's age, education, work experience and residual functional capacity, the ALJ found that there were jobs in the national economy that Plaintiff could perform.  (Tr. 23.)  Therefore, the ALJ concluded that Plaintiff had "not been under a disability, as defined in the Social Security Act, from May 22, 2005 through July 1, 2008."  (Tr. 23.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including

10

that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

#### 1. Substantial Evidence Supports the ALJ's Step Three Determination

In her Motion for Summary Judgment, Plaintiff contends that the ALJ erred in finding that she did not have a mental impairment that met Listing of Impairment 12.04. (Dkt. 10, Pl.'s Mot. Summ. J. at 20.) Plaintiff argues that the ALJ did not appropriately consider paragraph (B) of that listing which states that a claimant's mental impairment must result in "marked restriction" of

11

activities of daily living, social functioning, or concentration.  20 C.F.R. Pt. 404, Subpt. P., App'x 1, 12.04(B).  The ALJ found that Plaintiff suffered from only mild or moderate restrictions in these areas and not marked restrictions.  (Tr. 16.)  Plaintiff claims this is an error, and that, indeed, she suffers from "marked restrictions of activities in daily living."  (Pl.'s Mot. Summ. J. 16.)  Her main evidence in support of this contention is her own testimony regarding her daily activities.  (Pl.'s Mot. Summ. J. at 19.)  Plaintiff claims that the ALJ should have given her testimony regarding her daily activities more weight.  (Pl.'s Mot. Summ. J. at 19.)

Regarding an individual's credibility, SSR 96-7p states:

> [T]he adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding of credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."

Moreover, SSR 96-7p contains a procedural requirement that requires the ALJ's decision to list "specific reasons" for his credibility determination in his decision:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

An ALJ's findings regarding the credibility of an applicant are to be accorded great weight and deference, particularly since only the ALJ is charged with the duty of observing a witness's demeanor.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here,  the ALJ followed the mandate provided by SSR 96-7p.  The ALJ stated two explicit

12

reasons for discounting Plaintiff's testimony: 1) there was no objective verification of Plaintiff's testimony as to her daily activities; and 2) given the medical evidence on the record, the ALJ could not attribute her alleged limited activities to her medical condition. (Tr. 18.)

The ALJ gave consideration to the records and opinions of all the mental health practitioners – including the differing GAF scores.[5] These records provide substantial evidence that Plaintiff's alleged mental impairments did not meet or medically equal Listing 12.04.

First, Plaintiff reported symptoms of depression to her doctors as far back as 1999, when she was still working. Indeed, Plaintiff's sister told Dr. Dziuba that Plaintiff had been paranoid for 5 or 10 years before her alleged onset date. (Tr. 18, 111, 127, 163-64, 206). In evaluating a claimant's impairments, and their impact on daily activities, an ALJ may consider the claimant's ability to work in the past notwithstanding them. *Swann v. Chater*, 1996 U.S. App. LEXIS 19149, *14 (6th Cir. 1996) (unpublished) ("Claimant's ability to work despite these physiological conditions militates against his claim that these conditions were disabling.").

Second, contrary to her hearing testimony that treatment and medication for depression did not help, Plaintiff frequently told her practitioners that her depression had improved and that medication kept it stable. (Tr. 19.)

For example, the medical records reveal that on June 30, 2005, Plaintiff told Dr. Dziuba that she felt that people would "work against her . . . at work because 'they are jealous,'" but she "did not feel significantly depressed." (Tr. 210.) At a follow-up appointment two weeks later, Plaintiff reported that her family had told her she had "gotten better," but that she was "too paranoid" because

---

[5] While the ALJ did not find that Plaintiff's mental impairments rendered her disabled, he did assess limitations in his RFC finding to account for these impairments.

she thought everyone was against her. (Tr. 208.)  Plaintiff again told Dr. Dziuba that she was "not depressed" (Tr. 208).  Plaintiff returned to Dr. Dziuba on July 28, 2005, and told him that she was "doing well and did not think she needed to be at the clinic" because she was "not depressed." (Tr. 206.)  She did, however, express paranoid feelings. (Tr. 206.)  Plaintiff's sister told Dr. Dziuba that Plaintiff was "occasionally sad" but seemed to be "doing better on the medication." (Tr. 206.)  In August 2005, Dr. Dziuba noted that Plaintiff "appeared somewhat improved," and Plaintiff agreed. (Tr. 201.)  The record reflects no further treatment by Dr. Dziuba.

The "good days/bad days" nature of Plaintiff's depression was further supported by the medical records pertaining to the visits with Clinical Nurse Practitioner Frazier. (Tr. 19.)  On January 23, 2006, Plaintiff "described improvement in her depressive symptoms" that had begun in 2005 and denied any psychotic syndrome.[6] (Tr. 259-60.)  Plaintiff returned to Detroit Medical Center for medication refills in March 2006. (Tr. 258.)  Paxil was "helping her depression." (Tr. 258.)  Twice during April 2006, Plaintiff saw Social Worker Claire Smith, M.S.W., for counseling, and Nurse Frazier, for a medication review. (Tr. 251-52, 254-55.)  Both times, Plaintiff indicated that her depressive symptoms were stable. (Tr. 252, 255.)  Plaintiff returned to Smith and Frazier on June 8, 2006. (Tr. 250.)  She appeared depressed to both therapists. (Tr. 248-50.)  Nurse Frazier noted that Plaintiff had stopped taking or run out of some of her medications. (Tr. 249.)  At her next session with Nurse Frazier on August 30, 2006, Plaintiff reported taking her medications as prescribed, and tolerating her pain more effectively. (Tr. 247.)  She was more verbal, her mood was brighter, and she had no psychotic symptoms. (Tr. 246.) Two weeks later, Plaintiff reported a stable mood and "feeling

---

[6] Plaintiff also described being able to understand what her cat and dog said, not because she heard actual voices, but because it was "like [she] just knew what they want." (Tr. 260.)  She discussed this same perceived ability at other therapy sessions as well.  (Tr. 250-54.)

much less depressed." (Tr. 247.)   At Plaintiff's October 2006 follow-up, Nurse Frazier again described Plaintiff's mood as brighter and more stable. (Tr. 244.)  Plaintiff missed her November appointment because she had the flu, but told Nurse Frazier by phone that her depressive symptoms were stable. (Tr. 245.) At her December 1, 2006, appointment with Nurse Frazier, Plaintiff discussed the death of her younger brother and reported increased depressive symptoms. (Tr. 245 and 240.) Nurse Frazier evaluated Plaintiff again on December 20, 2006. (Tr. 240-41.) Plaintiff reported her mood was a 6 on a scale where 10 was the best, an improvement from "as bad as a 1" when she started therapy. (Tr. 241.) Plaintiff had recently felt "helpless and hopeless," with decreased motivation and energy, due to her back problem.  (Tr. 241.) Nurse Frazier assessed bipolar disorder, but could not rule out major depression or schizoaffective disorder, and assessed a GAF score of 46 with a past high of 48. (Tr. 241.)  He prescribed Lithium and additional therapy. (Tr. 241.)  The record before the ALJ reflected no further medical treatment between December 2006 and February 2008 when Plaintiff saw Dr.  Landover.

Similarly, Dr. Mangulabnan found that Plaintiff's statements did not substantiate her allegations about her mental condition and concluded that Plaintiff did not meet the criteria for a mood or anxiety disorder.  (Tr. 219-220.)

In short, given the above-cited medical evidence, substantial evidence existed to discount Plaintiff's testimony.

Plaintiff also claims that the ALJ's finding that her mental impairment did not meet the durational requirements for disability was erroneous.   (Pl.'s Mot. Summ. J. at 21.)

As stated above, the Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

15

> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than ***12 months***.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI) (emphasis added).

To support her contention that she had a mental impairment that lasted "not less than 12 months," Plaintiff points to Dr. Lachover's assessment of her in 2008 that indicated she suffered from "major depression with psychotic features" and "paranoid disorder." (Tr. 266.) Using this assessment, Plaintiff claims that she suffered from depression from her onset date of May 22, 2005 through 2008 "continuously." (Pl.'s Mot. Summ. J. at 21.)

The ALJ found, as supported by the mental health records discussed above, Dr. Lachover's assessment to be "an isolated report that [was] inconsistent with the mental health treatment since her alleged onset date." (Tr. 20.) Further, he stated that Dr. Lachover's assessment alone "does not satisfy the durational requirements for a finding of 'disability.'" (Tr. 20.)

Moreover, the medical records confirm that Plaintiff was able to work despite her depression. (Tr. 19.) Therefore, the ALJ had substantial evidence to conclude that: "In addition to a previous ability to work despite depression, there is no consecutive 12 months when her mental health was such that she could be considered disabled." (Tr. 19.)

Lastly, Plaintiff also claims that because the ALJ pointed to "gaps" in Plaintiff's history of treatment, he had a duty to more fully develop the record. (Pl. Mot. Summ. J. at 23.) However, it is clear from the record that the ALJ did not consider the record inadequately developed, but rather pointed out: "there are no mental health treatment notes from 2007." (Tr. 19.) Indeed, the ALJ indicated in a footnote, that "there [was] enough of a treatment record to get a good assessment of Claimant's overall picture of medical evidence." (Tr. 19.) Well-established case law mandates that

16

this Court defer to the ALJ's decision with regard to whether a record is fully and fairly developed. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Given this case law and the fact that the ALJ explicitly noted that he had enough evidence to assess Plaintiff, the Court finds there was substantial evidence to support the ALJ's finding that Plaintiff did not suffer from the requisite "marked limitations" defined in Listing of Impairment 12.04. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, 12.04(B).

### 2. *The ALJ Gave Proper Weight to Plaintiff's Treating Physicians*

Plaintiff next argues that the ALJ erroneously gave little or no weight to her treating doctors' medical opinions in making his determination. (Pl.'s Mot. Summ. J. at 20, 24-25.) Under the applicable regulations, greater deference is given to the opinions of a treating physician than to those of a non-treating physician; this is commonly known as the treating physician rule. *See* SSR 96-2P; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).[7] "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not inconsistent with the other substantial evidence in [the] case record.'" *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)). And where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the

---

[7] The rational behind this rule is that:

> [treating physicians] are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2).

17

nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. §§ 404.927(d)(2), 404.1527(d)(2).

Moreover, 20 C.F.R. §§ 404.1527(d)(2) (and § 416.927) "contain[] a clear procedural requirement" that requires the ALJ to give "good reasons" for the weight given to the treating source's medical opinion. 20 C.F.R. §§ 404.927(d)(2), 404.1527(d)(2).

In November 2006, Plaintiff's treating physician, Dr. Haney, submitted a handwritten letter listing a number of diagnoses and physical limitations. (Tr. 262-64.) Plaintiff contends the ALJ inappropriately discounted this hand-written letter (Pl.'s Motion Summ. J. at 25.) However, a review of the ALJ's decision indicates that he followed the dictates of 20 C.F.R. §§ 404.1527(d)(2)(DIB).

Dr. Haney's letter was not accompanied by any treatment notes or medical records. (Tr.262-64.) The ALJ indicated that Dr. Haney's "clinical findings are rejected to the extent that they are inconsistent with consultative examiner Dr. Shelby-Lane's observations upon examination."[8] (Tr. 21.) Other than some back pain on palpitation, Dr. Shelby-Lane found no obvious spinal deformities, swelling, muscle spasms, muscle atrophy or joint deformities. (Tr. 225.) Plaintiff was wearing an elastic back brace, and using a cane but did not need to use the cane during Dr. Shelby-Lane's exam. (Tr. 225.) Plaintiff had a slow, normal, gait and stance, and could perform all of the walking exercises of Dr. Shelby-Lane's exam. (Tr. 225.) Her manipulative abilities were intact, and her reflexes were normal. (T 225.) She could flex to 80 out of 90 degrees in her lumbar spine, and all other range of motion testing was normal. (T 227.) Thus, the ALJ found that Plaintiff's treating

_____

[8] As noted previously, there is no indication in the record that Dr. Haney actually saw or consulted with Plaintiff on or around November 22, 2006, prior to his submission of the above-cited hand-written note in the record. (Tr. 262.)

physician's opinion was inconsistent with the other substantial evidence in the case record. (Tr. 21.) Pursuant to this finding, the applicable regulations permit the ALJ to give a treating physician's opinion less than controlling weight. 20 C.F.R. §§ 404.927(d)(2), 404.1527(d)(2).

Second, the ALJ clearly stated that he was giving Dr. Haney's opinion "some weight" but would discount it to the extent it was inconsistent with Dr. Shelby-Lane's observations and to the extent the "clinical findings are not supported by treatment records noting . . . the durational requirements necessary to a finding of 'disability.'" (Tr. 21.) Therefore, the ALJ considered (1) the frequency of examination, (2) the lack of relevant evidence presented by Dr. Haney to support his opinion, and (3) the inconsistency of Dr. Haney's opinion with the record. Accordingly, the ALJ provided "good reasons" for not giving Dr. Haney's opinion controlling weight.

Plaintiff also seems to contend that the ALJ should have given more weight to Dr. Dziuba's opinion and the opinion of Nurse Practitioner Fraser. (Pl.'s Mot. Summ. J. at 25.) Plaintiff argues that the ALJ "gave little weight to the opinion of the treating doctor with regard to the GAF scores of 46 and 48." (*Id.*) The record indicates the Dr. Dziuba and Nurse Practitioner Fraser gave Plaintiff these scores. (Tr. 213 and 241.) First, as is clear from the discussion above, the ALJ gave the records from Dr. Dziuba and Nurse Practitioner Fraser extensive, if not controlling, weight. (Tr. 19.) Second, as also indicated above, a GAF score is not a medical opinion. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Accordingly, an ALJ is not required to address the score in his narrative decision or give a score any particular weight. *Id.* Therefore, the ALJ properly weighed the evidence from Plaintiff's treating physicians.

### G. Conclusion

For the forgoing reasons, the Court finds that the Commissioner's determination that Plaintiff

is not disabled is supported by substantial evidence.  Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

### III.  Filing Objections

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: March 31, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 31, 2011.

s/Susan Jefferson
Deputy Clerk